# EXHIBIT 7

# SYMPOSIUM: CLASS ACTIONS IN THE GULF SOUTH AND BEYOND: Hurricanes, Mobility, and Due Process: The "Desire-to-Inform" Requirement for Effective Class Action Notice Is Highlighted by Katrina

June, 2006

**Reporter**
80 Tul. L. Rev. 1771 *

**Length:** 16590 words

**Author:** Todd B. Hilsee*, Gina M. Intrepido+, Shannon R. Wheatman**

* President of Hilsoft Notifications. Mr. Hilsee has been recognized by federal and state judges as an expert on the adequacy of notice, having pioneered the use of media audience data to quantify the "net reach" of unknown class members. A leading advocate of noticeable notices, in January 2002, he testified before the Advisory Committee on Civil Rules of the Judicial Conference of the United States about the proposed "plain language" amendment to Rule 23 of the Federal Rules of Civil Procedure (Rule 23) and subsequently collaborated to write and design the illustrative "model" plain language notices at the request of the Federal Judicial Center. Federal Judicial Ctr., "Illustrative" Forms of Class Action Notices, http://www.fjc.gov (follow the "Class Action Notices Page" hyperlink) (last visited Apr. 21, 2006). He was the first notice expert recognized in Canada under the Ontario Class Proceedings Act of 1992. He has published numerous articles on notice and due process. Hilsee spent the majority of his advertising career with Foote, Cone & Belding Worldwide, the largest U.S. domestic advertising firm, where he was awarded the American Marketing Association's award for effectiveness. Mr. Hilsee received his B.S. in Marketing from Pennsylvania State University.

+ Vice President and Media Director of Hilsoft Notifications. Ms. Intrepido has over fourteen years of media planning, research, and buying experience. An advertising media audience data/reach and frequency calculation specialist, she began her career in New York at one of Madison Avenue's leading firms, BBDO Worldwide, preparing the sophisticated media planning studies for major national consumer advertising accounts and brands such as Gillette, GE corporate and appliance brands, Lever Brothers, HBO, and others. Ms. Intrepido has planned numerous judicially approved notice plans including the Paxil consumer settlement, the In re Lupron Sales & Marketing Practices Litigation, as well as many notice campaigns involving broadcast media including the Masonite hardboard siding settlement that included the first live-action testimonial television notice campaign, and the Weyerhaeuser Hardboard Siding claims campaign, involving radio selected through a detailed claims/population cross-tabulation analysis. She earned a B.A. in Advertising from Pennsylvania State University, graduating with the highest honors.

** Vice President and Notice Director of Hilsoft Notifications. The author of numerous court-approved notices, Dr. Wheatman served in the Research Division of the Federal Judicial Center. She worked with the Civil Rules Advisory Committee on attorney surveys on the effects of the Amchem/Ortiz cases on choice of federal or state forum in class action litigation. She also played an integral part in the development of the model notices to satisfy the plain language notice amendment to Rule 23. Dr. Wheatman holds a Ph.D. in Social Psychology from the University of Georgia and a Masters in Legal Studies from the University of Nebraska-Lincoln. In 2000, she received first place in a professional research writing competition from the American Society for Trial Consultants for her research on comprehension of jury instructions in an insanity defense trial. The authors are principals with Hilsoft Notifications, a Philadelphia-area communications firm recognized by courts as class action notice experts who have written, designed, disseminated, and/or analyzed notice in some 299 class action cases and given notice in more than 53 countries and 36 languages. The authors would like to thank New Orleans class action attorneys Dawn M. Barrios and Donald K. Haycraft for helping them gain an understanding of the enormous difficulties experienced by the population of the city as a result of Hurricane Katrina.

80 Tul. L. Rev. 1771, *1771

# Text

[*1772]

I. Introduction

 As necessarily retold in a recent court decision in one of numerous lawsuits related to Hurricane Katrina, which struck "on August 29, 2005, at around 6:10 a.m., Hurricane Katrina devastated the Gulf Coast of the United States." [1] The storm made landfall in Southeastern Louisiana, and then moved across Mississippi and Alabama, destroying houses and other structures. [2] After the storm, the levees in New Orleans were breached and 80% of metropolitan New [*1773] Orleans was submerged under water. [3] Elsewhere the storm spared few, destroying a vast majority of the structures along Mississippi's Gulf Coast. [4]

Pursuant to the storm and flooding, thousands of people were forced from their homes and more than 1000 people died, mostly in Louisiana. [5] The fate of the evacuees, their whereabouts, and whether the demographics of those affected and displaced by the hurricane reflected a disproportionate number of low income and/or minority people has been extensively written about, published, and broadcast nationally. [6]

Though secondary to matters of human suffering, what has not been adequately discussed in legal forums to date, are the problems faced by the courts that must inform these displaced people of their rights to participate in class action lawsuits pending on their behalf. The ability to do so is greatly impacted not only by the mobility, but also by the demographics of those displaced. While it would be easy to go through the motions to give notice - for example, simply mailing a notice to a last known address - that approach may not satisfy due process.

This Article reviews the high standards that class action notice efforts must meet in order truly to satisfy due process considerations: the added difficulties that a mobile population places on the notice expert, especially a class heavily concentrated within the lower socioeconomic segments of society; the solutions employed in several cases before and since those fateful late summer days of 2005; and the lessons learned which highlight the importance of notice in any class action.

II. Reactions to Katrina in Class Action Notice Situations

 Generally, dealing with ensuing notice issues in class action cases has thus far revolved around three main areas:
[*1774]

(1) taking steps to seek current addresses for evacuees,

(2) employing enhanced publication or media programs to reach dislocated people not practicable to reach by mailings, and

(3) allowing more time for notices to reach people and for responses to come back.

---

[1]  *McWaters v. FEMA, 408 F. Supp. 2d 221, 223-23 (E.D. La. 2005).*

[2] See John M. Barry, After the Deluge, Some Questions, N.Y. Times, Oct. 13, 2005, at A1.

[3] See Gordon Russell, Frustrated Homeowners Look to New FEMA Flood Maps for Ansers, but There's No Guarantee the Advisories Won't Pose Even More Questions, Times-Picayune (New Orleans), Mar. 27, 2006, at 1.

[4] See Barry, supra note 2, at A1.

[5]  See Associated Press, Death Toll from Katrina Likely Higher than 1,300, MSNBC.com, Feb. 10, 2006, http://www.msnbc.msn.com/id/11281267/.

[6] See Arloc Sherman & Isaac Shapiro, Ctr. on Budget & Policy Priorities, Essential Facts about the Victims of Hurricane Katrina 1 (2005), http://www.cbpp.org/9-19-05pov.pdf; Associated Press, Katrina's Ground Zero Victims Unlike Rest of America, Census Analysis Shows, Sept. 4, 2005, http://www.abc2news.com/news/new-site/05-09-04-katrina-demographics.shtml.

A. Obtaining Current Addresses

 For cases involving situations where names and addresses are available, additional efforts to find the best, most up-to-date addresses have been taken post-Katrina. For example, in Froeber v. Liberty Mutual Fire Insurance Co., the Circuit Court of Marion County, Oregon, ordered the defendant to search its databases for the last known addresses of all class members and to send notices and further ordered that if the notices were returned as undeliverable, to conduct a reasonable search for a better, more current address and then to remail the notices.  [7] In fact, the Froeber notice effort in light of Katrina went even further: the list of class members was updated using the United States Postal Service's (USPS) National Change of Address (NCOA) database before mailing, returned mailings were further searched for better addresses available from the Post Office and then remailed, and thousands of pieces remaining undeliverable were remailed following a "lookup" using third-party address correction services.  [8]

A New Orleans federal court approved a notice plan that contemplated similar NCOA address updating efforts in In re High Sulfur Content Gasoline Products Liability Litigation.  [9] To be sure, cases specifically impacting displaced Gulf Coast residents will create enormous address updating difficulties that will have to be confronted through unique and careful address correction efforts. In twenty-six consolidated class action cases involving the release of oil from a Murphy Oil tank in St. Bernard Parish in the first week of September, 2005, each involved class member is a displaced person living or working elsewhere, due to contamination of the person's already storm-damaged property.  [10]

 [*1775]  Another case, In re Educational Testing Service, involves displaced teaching candidates, many of whom resided in Louisiana prior to Hurricane Katrina.  [11] In that case, the court approved not only NCOA efforts, but also proprietary database lookups on all names for which NCOA did not return a new address, owing to the fact that social security numbers were readily available from the defendants, and such data could be used to cross-tabulate with credit bureau data to obtain any newer addresses contained therein.  [12]

B. Enhancing Media Coverage

 Often, all of the names and pre-Katrina addresses are not available to begin with; thus, it is preferable to initiate further methods to ensure adequate notice dissemination, rather than merely attempting to update illusive pre-Katrina addresses. In such situations, other means, such as publication, can be enhanced beyond what normally would have been undertaken pre-Katrina.

In Froeber, a comprehensive national mailing list of policy-holders, claimants, and medical providers was available.  [13] Pre-Katrina, notice in a case like Froeber may have been undertaken almost exclusively by mail. However, the aftermath of Katrina created a need for notices to be published in publications that circulated in hurricane evacuee areas; these efforts were carefully planned using Federal Emergency Management Agency (FEMA) relocation data and media usage statistics.  [14] In In re High Sulfur Content, a case involving class members in hurricane-impacted states for which mailing lists did not allow comprehensive coverage of the total class, an even more detailed analysis of FEMA relocation data along with gasoline sales

---

[7]  See No. 00C15234 (Cir. Ct. Marion County, Or. Nov. 30, 2005) (third amended order preliminarily approving settlement).

[8]  See id.

[9]  MDL No. 1632 (E.D. La. filed Jan. 20, 2005) (preliminary approval of settlement order).

[10]  See Turner v. Murphy Oil USA, Inc., No. Civ.A. 05-4206, 2006 WL 267333, at 1, 4, 6, 17 (E.D. La. Jan. 30, 2006).

[11]  In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig., MDL No. 1643 (E.D. La. Mar. 13, 2006), available at http://mdl1643.laed.uscourts.gov/Orders/Orders.htm (preliminary approval of settlement order and class certification order).

[12]  See id.

[13]  See Froeber v. Liberty Mut. Fire Ins. Co., No. 00C15234, at 6 (Cir. Ct. Marion County, Or., Nov. 30, 2005) (third amended order preliminarily approving settlement).

[14]  See id. at 7-8.

data dictated that notices appear not only where the gasoline in question was sold, but also throughout the states in which more than 90% of gasoline purchasers who had evacuated from Hurricanes Katrina, Rita, or Wilma, now reside. [15]

Indeed, in the wake of Katrina, courts have reported that notice is an important consideration and have urged parties to agree upon [**1776**] appropriately enhanced notice. Notably, in McWaters v. FEMA, a case involving claims that residents displaced by hurricanes were denied adequate notice of available housing payments, the United States District Court for the Eastern District of Louisiana considered the plaintiffs' request for more notice by public service announcements, television, radio, and newspaper advertisements. [16] While noting that it was not aware of any mandatory provision for such efforts under the circumstances, the court "strongly urged the parties to reach an agreement on these issues." [17]

C. Allowing More Time

 A number of courts have allowed claimants and class members more time to exercise legal options before the expiration of rights. [18] Extra time helps because delay in the delivery of mail is one of the significant problems related to Katrina (and has remained a problem for months afterwards) even when people remained at their pre-hurricane residences. Of course, more time also facilitates the postal service's effort to forward mail to Katrina evacuees at their new addresses.

In In re High Sulfur Content, more than eight months were allotted to allow claims to be filed after preliminary court approval - this period is commonly 120 days or less. [19] In Froeber, approximately 90 days were allowed for exclusion requests and objections to be filed, a period that is commonly 45 days or less. [20]

These types of allowances have been made in many cases that engendered analogous legal issues and circumstances as Hurricane Katrina engendered. These allowances may include extending an opt-out date prior to a trial, pushing out the date by which a class member must object to a proposed settlement, and lengthening the period in which a class member must apply for benefits in a settlement claims process. Illustratively, Holocaust survivors were given some 180 days to submit a "registration" document, owing to worldwide notice issues [**1777**] in In re Holocaust Victim Assets Litigation. [21] Courts are often amenable to extensions for late claims, for example in Nilsen v. York County, the court extended a set date by 60 days after attorneys requested it. [22] In In re "Agent Orange" Product Liability Litigation, the court not only allowed late claims, but also permitted class members who had previously opted out to make claims on the settlement fund. [23] As expressed in an appellate decision allowing a late claim in the In re Orthopedic Bone Screw Products Liability Litigation, the "excusable neglect" standard articulated under Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership, [24] which allows

---

[15]  MDL No. 1632 (E.D. La. filed Jan. 20, 2005) (class settlement agreement).

[16]  No. Civ.A.05-5488, 2005 WL 3642730, at 1-6 (E.D. La. Dec. 12, 2005).

[17]  Id.

[18]  See, e.g., In re High Sulfur Content, MDL No. 1632 (class settlement agreement) (extending the time period in which proposed class members may file complaints).

[19]  See id.

[20]  See Class Action Notice, http://www.gasclaims.com (last visited Apr. 12, 2006); Class Action Notice, http://www.froeberclaims.com (last visited Apr. 12, 2006).

[21]  In re Holocaust Victim Assets Litig., 319 F. Supp. 2d 301, 321-22 (E.D.N.Y. 2004) (discussing the millions of possible account holders (claimants) and the potential for notice issues involved in the case).

[22]  400 F. Supp. 2d 266, 284 (D. Me. 2005).

[23]  689 F. Supp. 1250, 1261-63 (E.D.N.Y. 1988).

[24]  507 U.S. 380, 391-92 (1993). District courts in the Third Circuit have used the "excusable neglect" standard to analyze late claims in class actions. See, e.g., In re Cendant Corp. Prides Litig., 189 F.R.D. 321, 324 (D.N.J. 1999); Georgine v. Amchem Prods., Inc., Civ. A. No. 93-0215, 1995 WL 251402, at 3 (E.D. Pa. Apr. 26, 1995). There is authority for the correctness of doing so. See Supermarkets Gen. Corp. v.

80 Tul. L. Rev. 1771, *1777

consideration of tardy submissions, applies not only to situations where the late filing was due to circumstances beyond the control of the party, but also in other situations. [25] Excusable neglect "is a somewhat "elastic concept' and is not limited strictly to omissions caused by circumstances beyond the control of the movant." [26] Clearly, Hurricane Katrina's effects need no elastic view of the circumstances, as it was impossible for many class members to act within a normal time period and late filings were, and will continue to be, due to circumstances beyond the class members' control. Even the Manual for Complex Litigation states: "The court should allow adequate time for late claims before any refund or other disposition of settlement funds occurs, and might consider ordering a reserve for late claims." [27] Nonetheless, courts also may apply a more rigid standard and reject late claims for a variety of reasons - even based on factors that may be [*1778] out of respondents' control. For example, in Dahingo v. Royal Caribbean Cruises, Ltd., the court recognized that under Zients v. LaMorte, [28] late claims were allowed because "allowing … five claims would result in only a minuscule reduction in recovery by timely plaintiffs," and further noted that Pioneer does not apply because the deadline was "moored in contract principles." [29] The Dahingo court rejected late claims noting:

It is no doubt true, as class counsel argue, that many of the claimants may have missed the time bar through no fault of their own. Some may not have received notice of the settlement until the deadline was upon them. Others may have had difficulty locating postal facilities or may have underestimated the time it would take for mail to be delivered. However, class counsel were well aware of such hazards during negotiations and were presumably satisfied that the deadline ultimately agreed upon took reasonable account of these concerns. [30]

Eerily, these are many of the same delay factors that Katrina victims could plea, if an argument over the acceptability of late-claim submissions now arises.

III. The Standards for Effective Notice

Whether any of the prescriptions that courts have employed thus far to deal with notice issues in the wake of Hurricane Katrina are appropriate, solutions in any given class action is entirely dependent on the circumstances of that particular case. Indeed, Hurricane Katrina causes us to focus on notice considerations that are important for many different situations. Whenever we are faced with notifying class members, we must realize that communicating legal information to lay people (i.e., typical class members) is difficult. The Advisory Committee on Civil Rules of the Judicial Conference of the United States reinforced these principles in the committee notes accompanying *Rule 23(c)(2) of the Federal Rules of Civil Procedure*:

The direction that class-certification notice be couched in plain, easily understood language is a reminder of the need to work unremittingly at the difficult task of communicating with class members. It is difficult to provide information about most class actions [*1779] that is both accurate and easily understood by class members who are not themselves lawyers. [31]

---

*Grinnell Corp., 490 F.2d 1183, 1186 (2d Cir. 1974).* A pair of decisions from the Cendant Prides litigation notes that the "excusable neglect" standard, as announced in the Supreme Court's ruling in Pioneer Investment Services provides the analysis for consideration of untimely claims for inclusion in a class action settlement. See *In re Cendant Corp. PRIDES Litig. (Cendant II), 235 F.3d 176, 180 (3d Cir. 2000); In re Cendant Corp. PRIDES Litig. (Cendant I), 233 F.3d 188, 196 (3d Cir. 2000).*

[25] See *In re Orthopedic Bone Screw Prods. Liab. Litig., 246 F.3d 315, 324 (3d Cir. 2001).*

[26] *Id. at 322* (quoting *Pioneer Inv. Servs., 507 U.S. at 392).*

[27] Manual for Complex Litigation (Fourth) 21.662 (2004) (internal footnote omitted).

[28] *459 F.2d 628, 630 (2d Cir. 1972).*

[29] *Dahingo v. Royal Caribbean Cruises, Ltd., 312 F. Supp. 2d 440, 446 (S.D.N.Y. 2004)* (quoting *Zients, 459 F.2d at 630,* and distinguishing *Pioneer Inv. Servs., 507 U.S. at 391).*

[30] *Dahingo, 312 F. Supp. 2d at 448.*

[31] *Fed. R. Civ. P. 23(c)(2)* advisory committee's note.

80 Tul. L. Rev. 1771, *1779

 The facts that the hurricane evacuees as a whole were in fact disproportionately lower income and minority people, the enormous mobility of our populations today, and the even greater mobility of lower income people often affected by many class actions (for whom it is most difficult to update addresses), all heighten the difficulty of communicating with class members affected by class action cases - hurricane or no hurricane. [32]

Therefore, post-Katrina, it is even more important to understand the standards for effective notice which include: allowing people to understand the information by writing and designing clear, plain language notices; crafting dissemination plans borne out of a desire to actually inform the people affected by them; and performing calculations (and providing the court with quantifiable evidence) to ensure that class members are effectively reached.

A. Plain Language

 A recent focus has been placed on improving communication with class members through "plain language." [33] Indeed, the revision to Rule 23(c)(2), which calls for notices in "clear, concise, easily understood language" [34] is now in place and has been a critical advance towards improving communications. In fact, the authors of this Article collaborated on writing and designing the Federal Judicial Center's (FJC) illustrative plain language notices. [35] The plain language movement follows the reality that people do not readily comprehend class action terminology. In fact, FJC research on class action notices **[*1780]** determined that even the terms "class" and "class action" were confusing to average readers. For example the FJC study found

converting the notice to plain language is not the only way to improve communications with class members… . Experience tells us that attorneys and judges can significantly improve class members' motivation to read and comprehend class action notices by changing the language, organizational structure, format, and presentation of the notice. [36]

 Indeed, the illustrative FJC plain language notices take not only wording, but also design features into account. [37]

It is vital to have plain language in class action notices. Yet, before the recent change to Rule 23, neither the federal class action rule nor the rules of various states required plain language notices. Additionally, there was not much in case law on the topic. [38]

---

[32] See John R. Logan, The Impact of Katrina: Race and Class in Storm-Damaged Neighborhoods 1 (2006), available at *http://www.s4.brown.edu/katrina/report.pdf*.

[33] Plain language is the "writing and setting out of essential information in a way that gives a co-operative, motivated person a good chance of understanding the document at first reading, and in the same sense that the writer meant it to be understood." Martin Cutts, Unspeakable Acts Revisited, 9 Info. Design J. 39, 40 (1998).

[34] **Fed. R. Civ. P. 23(c)(2)**.

[35] Robert J. Niemic, The Federal Judicial Center's "Illustrative" Forms of Class Action Notices, available at *http://www.fjc.gov/* (follow the "Class Action Notices Page" hyperlink) (last visited Apr. 21, 2006). Mr. Hilsee worked with Dr. Terri LeClercq of the University of Texas School of Law and collaborated with the Federal Judicial Center (FJC) to write and design illustrative plain language class action notices. He followed on the heels of an enormous amount of research and early draft notices prepared and studied by the FJC's Research Division - under the direction of James Eaglin - by Robert J. Niemic, Thomas E. Willging, and Dr. Shannon R. Wheatman (now Hilsoft Notifications' Notice Director).

[36] See Fed. Judicial Ctr., Detailed Discussion of Methodology, *http://www.fjc.gov/public/home.nsf/pages/816* (last visited Apr. 12, 2006). The third author worked with the FJC on this research and is in collaboration with it to publish findings.

[37] See id.

[38] Very little appears in published decisions about the need for plain language notices, but courts have recently recognized the merits of simple wording. See, e.g., *In re Ikon Office Solutions, Inc. Sec. Litig., 209 F.R.D. 94, 101 (E.D. Pa. 2002)* ("The substance of the pre-settlement notice was adequate, as was the Settlement Notice. The Settlement Notice contained a detailed explanation of the terms in plain language … .").

80 Tul. L. Rev. 1771, *1780

Certainly the content of notices are important. Sufficient information must be in a notice; notices must conform to the requirements in the rules; and notice writers should consider the suggestions in the FJC's Manual for Complex Litigation. [39] In fact, one appellate court has found that notice content must satisfy due process requirements stating:

To satisfy this principle, it is not only necessary that the notice reach the parties affected but that it convey the required information… .

… .

… Surely the best notice practicable under the circumstances cannot stop with … generalities. It must also contain an adequate description of the proceedings written in objective, neutral terms, that, insofar as possible, may be understood by the average absentee class member … . [40]

A California federal court decision highlighted the importance of clarity of communication: "Due process demands that the options **[*1781]** available to class members and the consequences of their elections be detailed with sufficient clarity to afford absent members a realistic opportunity to evaluate alternative options available to them." [41]

Legal requirements aside, long-standing and well-regarded communications guidelines demand that notices be written plainly, [42] be based on an understanding of what average readers will want to read, [43] as well as recognize the broad range of demographics of typical class members. The fact is that only a small percentage (23.2%) of our U.S. adult population has graduated from college. [44] These issues are placed in focus by Katrina, because those affected include a disproportionate number of less-educated and lower-income people: In the Gulf Coast region as a whole, 20.9% of households had income below the poverty line in damaged areas, compared to 15.3% in undamaged areas. [45] Of course, as lower incomes translate to lower education levels, notice content and readership is impacted. As David Ogilvy, one of the fathers of modern advertising stated "it is a mistake to use highfalutin language when you advertise to uneducated people." [46]

So, plain language is just, well, plainly important. The "plain language" amendment to Rule 23(c)(2) helps ensure that people can understand notices that reach them. But the ever-present, albeit less-studied, issues surrounding whether people are reached in the first place, even more than plain language itself, is brought into play when practitioners and the courts face hurricane-related notice issues involving mobility and demographics. Notices cannot be understood if they do not come to the attention of the class members affected by them, and class members cannot "notice" the notices if they are not "reached" by the notice campaign in the first place.

B. Due Process Requires a Desire To Inform

---

[39] Manual for Complex Litigation (Fourth), supra note 27, 21.3.

[40] *Twigg v. Sears, Roebuck & Co., 153 F.3d 1222, 1227 (11th Cir. 1998)* (quoting *In re Nissan Motor Corp. Antitrust Litig., 552 F.2d 1088, 1103-05 (5th Cir. 1977)* (quotations and citations omitted)).

[41] *McCubbrey v. Boise Cascade Home & Land Corp., 71 F.R.D. 62, 67 (N.D. Cal. 1976).*

[42] Advertising should say it straight, plain, and simple." Hank Seiden, Advertising Pure and Simple 7 (1990).

[43] Consider that the average reader is only once a reader, probably. And what you fail to tell him in that ad is something he may never know." Claude Hopkins, Scientific Advertising 29 (1952).

[44] Eric C. Newburger & Andrea E. Curry, U.S. Census Bureau, Educational Attainment in the United States (Update): Population Characteristics 1 (2000), available at *http://www.census.gov/population/socdemo/education/p20-536/p20-536.pdf*.

[45] See Logan, supra note 32, at 1.

[46] David Ogilvy, Confessions of an Advertising Man 112 (1987).

80 Tul. L. Rev. 1771, *1781

Class action notice is guided by rules and, in turn, by due process. Rule 23(b)(3) requires "the best notice practicable under the [**1782**] circumstances, including individual notice to all members who can be identified through reasonable effort." [47] The seminal decision on notice and due process is Mullane v. Central Hanover Bank & Trust Co. [48] This decision and others that have followed it help guide the notice expert on satisfying due process requirements under the United States Constitution:

But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected … . [49]

Satisfying due process obligations involves giving enough time for notice, as has been seen to be a prescription for bettering notice in the wake of Katrina: "In general, due process requires that reasonable notice is that which is reasonably calculated to reach all interested parties, reasonably conveys all of the required information, and permits a reasonable amount of time for response." [50] Due process also involves ensuring adequate publicity, and this need post-Katrina is further heightened: "The determination of whether a reasonable person would have discovered the information depends on various factors. The quality and quantity of the information or publicity is one factor." [51]

But, it is becoming even clearer that communications principles underlie the successful completion of due process obligations. A recent United States Supreme Court case following Mullane highlights the fact that practical "desire-to-inform" considerations are brought into question under Mullane. The decision in Jones v. Flowers, discusses at length some practical questions about what reasonable steps a person actually desiring to inform a property owner would take when a certified letter is returned unclaimed by the property owner with a pending tax sale of a house he owns:

If the Commissioner prepared a stack of letters to deliver to delinquent taxpayers, handed them to the postman, and then watched as the departing postman accidentally dropped the letters down a storm drain, one would certainly expect the Commissioner's office to prepare a new stack of letters and send them again. No one "desirous of actually [**1783**] informing" the owners would simply shrug his shoulders as the letters disappeared and say, "I tried." Failure to follow up would be unreasonable, despite the fact that the letters were reasonably calculated to reach their intended recipients when delivered to the postman … . [52]

The authors have written at length on the questions the notice expert and the legal practitioners must pose to themselves when seeking to satisfy the Mullane "desire-to-inform" test from a practical communications perspective: "Deciding on a plan to give notice, you must ask yourself: "Is this what I would do if I really wanted this class member to know his/her rights?" If you cannot answer "yes," your notice plan is likely defective. It probably violates due process. Ignoring this guidance can only result in rights being taken away from class members without giving them an adequate opportunity to learn about their rights, let alone exercise them." [53]

When people running businesses advertise, they actually desire to inform their intended audiences, and they do so with marketing campaigns that are designed to grab attention, be understood, and acted upon. They do not run small ads in the back

---

47   *Fed. R. Civ. P. 23(c)(2)(B)*.

48   *339 U.S. 306 (1950).*

49   *Id. at 315.*

50   *In re Robintech, Inc., 863 F.2d 393, 396 (5th Cir. 1989).*

51   *O'Connor v. Boeing N. Am., Inc., 92 F. Supp. 2d 1026, 1043 (C.D. Cal. 2000).*

52   *Jones v. Flowers, 126 S. Ct. 1708,1716 (2006).*

53   See Todd B. Hilsee et al., Do You Really Want Me To Know My Rights? The Ethics Behind Due Process in Class Action Notice Is More than Just Plain Language: A Desire To Actually Inform, *18 Geo. J. Legal Ethics 1362-63 (2005).*

80 Tul. L. Rev. 1771, *1783

of newspapers or send mailings in "fine-print" to last-known addresses captured many years ago. Unfortunately, this approach passes muster for class action notices in too many courts.

Communicating legal rights in a class action is certainly more important than advertising a product. If a person misses out on an ad for a used car sale, he pays a higher price (or finds another sale elsewhere). On the other hand, a person who doesn't hear about a class action that includes him/her loses his/her property rights - potentially for a very big claim. An easy class action "reasonably certain to inform" problem can be seen by looking at one of the many fine print legal class action notices still published - even after the FJC "model" illustrative notices have been promulgated. Such tiny small-font-sized notices are not reasonably certain to inform, they are instead almost certain not to inform. [54]

Of course, basic questions on what the reasonable person would do if they truly desired actually to inform Katrina victims comes into play. Two weeks after Katrina, half of the states in the United States were providing shelter for evacuees, and four weeks after Katrina, [*1784] evacuees had registered in all fifty states. [55] After Hurricane Katrina forced thousands of people to evacuate their homes and scatter throughout the United States, the notice expert need only ask himself: would I send a notice to a displaced person's former address, or would I publish a notice in the New Orleans area without regard to where evacuees are now located, if I actually wanted to inform them? Accordingly, it is quite easy to see how the "desire-to-inform" aspects of satisfying due process obligations are impacted by Hurricane Katrina.

C. Notice Calculated To "Reach" Class Members

The Supreme Court's decision in Mullane provides further communications guidance for the notice expert in reaching those class members displaced by Hurricane Katrina, or other natural disasters. Mullane teaches us that notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." [56]

The Supreme Court provides further direction on Rule 23's "best notice practicable" requirement in Eisen v. Carlisle & Jacquelin where the Court held:

[Providing] individual notice to identifiable class members is not a discretionary consideration to be waived in a particular case. It is, rather, an unambiguous requirement of Rule 23... . Accordingly, each class member who can be identified through reasonable effort must be notified that he may request exclusion from the action and thereby preserve his opportunity to press his claim separately or that he may remain in the class and perhaps participate in the management of the action. [57]

"Notice by publication will suffice under Rule 23(c)(2) and under the due process clause" when class members cannot be reached by mail. [58] Many courts have held that notice by publication is proper if class members' addresses are not reasonably identifiable or it is impracticable to achieve individual notice by mail. [59] The court ruled in [*1785] In re Domestic Air Transportation Antitrust Litigation that "if class members cannot be ... identified [through reasonable effort], there is no other requirement of mandatory individual notice, and the Court must exercise its discretion to provide the best notice practicable under the circumstances." [60]

---

[54] Id.

[55] Katrina's Exodus, Hurricane Aftermath, Times-Picayune (New Orleans), Oct. 13, 2005, at A18 (citing Federal Emergency Management Agency, Census Bureau, Queens College Sociology Department, and New York Times reports).

[56] Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).

[57] 417 U.S. 156, 176 (1974).

[58] Carlough v. Amchem Prods., Inc., 158 F.R.D. 314, 325 (E.D. Pa. 1993) (citing Mullane, 339 U.S. at 317-18).

[59] See, e.g., W. Va. v. Chas. Pfizer & Co., 440 F.2d 1079, 1090-91 (2d Cir. 1971); In re Domestic Air Transp. Antitrust Litig., 141 F.R.D. 534, 539 (N.D. Ga. 1992).

[60] 141 F.R.D. at 539.

80 Tul. L. Rev. 1771, *1785

Since Domestic Air, courts deserve and need to see conservative calculations to understand how well the class, on a net percentage basis, will be reached using a combination of notice vehicles (including media vehicles) in cases in which it is impracticable for mailings to sufficiently reach class members.

The notice expert can effectively reach class members via individual notice and/or publication notice, however, other creative methods of notice dissemination are sometimes necessary or appropriate, especially when class members have been displaced. For example, a television notice or a public service announcement is a good way to reach class members depending on the situation and class demographics. In a massive "race-based pricing" case known as Thompson v. Metropolitan Life Insurance Co., the court approved a settlement notice program that included TV notices. [61] In fact, live action/actor portrayal visual images (a first in legal notifications) were used to reach the huge class of African-American policyholders and descendants of policyholders since 1901. [62] Public service announcements allow a notice message to be broadcast over radio, which can reach displaced class members all over the country. In one prescription drug "pricing" case, the court-approved public service announcement was broadcast via radio throughout the United States which culminated in more than 61 million total adult audience impressions. These airings did not cost the settlement any additional money beyond distribution costs; however, if these radio spots had been paid advertising placements, the estimated dollar value would have been $ 1,508,229. [63] Courts readily approve ground-breaking notice programs without unreasonably impractical mailings in class actions that involve unknown class members if data demonstrates that the class was adequately reached by notice - by modern standards. In Domestic Air, the reach calculations allowed the court to conclude: **[*1786]** "The Court is convinced that the innovative notice program designed by plaintiffs not only comports with due process and is sensitive to defendants' res judicata rights, but it is the only notice program suitable for this unique and massive consumer class action." [64]

After Hurricane Katrina, geographic data became available on the location of evacuees, showing that while people moved at least temporarily to all 50 states, more than 90% of them evacuated to a handful of states within 400 miles. [65] It is, therefore, not only reasonable to reach a substantial percentage of evacuees in these states, it is also possible to calculate how many class members will be reached by notices in certain areas, and how many class members will be missed if notices are not placed in certain other areas. Courts need and deserve to know this information before approving a method of notice dissemination to a class of people, whether or not affected by a hurricane.

The authors have pressed the legal community with questions on how class members can be bound if only a small fraction of them - based on computations that most communications professionals regularly use - have been reached. How, if a notice plan relied on minimal publication or mailings to an old, outdated list, and cannot quantify who has been reached, class members can be fully bound nonetheless. Only in situations where the court is given data showing that a large percentage of people in the class had the chance to be effectively informed about their rights should class members be bound. Then the court will have no qualms in ruling that the notice satisfied due process and was the "best notice practicable." [66]

Before court adoption of a particular method of notice dissemination, a notice expert should provide data on the percentage of the class that will be reached by a notice program. As discussed below, these types of calculations are well-known and regarded in the communications field.The court should be educated and know that any method of notice dissemination can only be deemed adequate if a large percentage of the class is given an opportunity to know about and understand all of their rights and

---

[61] See _216 F.R.D. 55, 68 (S.D.N.Y. 2003)._

[62] See id.

[63] See In re Lupron Mktg. & Sales Practice Litig., MDL 1430 (D. Mass.), Affidavit of Todd B. Hilsee on Design, Implementation and Analysis of Settlement Notice Program, Apr. 6, 2005, at 3.

[64] _In re Domestic Air, 141 F.R.D. at 555._

[65] Katrina's Exodus, Hurricane Aftermath, supra note 55.

[66] See Hilsee et al., supra note 53, at 1364.

options. Without this information, the court is left to guess whether the class was adequately reached. "Ignoring this information is akin to ignoring readily available DNA evidence in a murder case." [67]

[*1787]

IV. Mobility, Demographics, Address Accuracy, and Mail Readership

 When mailing notices to class members is possible, concerns remain on mailing list accuracy, comprehensiveness, and economic practicality. These problematic mailing realities have been brought to the forefront by Hurricane Katrina, which displaced more than 1.36 million people from their former addresses; [68] 29.2% of the people who were living in Katrina-damaged areas of New Orleans lived below the poverty line. [69] These are the hardest populations to reach by mail and the hardest for which to obtain an updated or current address.

A. Mobility and Demographics

 A Brown University study has reported statistically on what many commentators have spoken and written about conceptually: the impact of Katrina has been felt the most by lower income individuals. [70] Sentiments expressed shortly after the storm, which gripped America with the possibility that the "enduring face of Hurricane Katrina - poor, black, single mothers, young, and old - struggling just to survive," are quantified in the Brown study. [71] The Brown study reports that the storm's effects were felt disproportionately by the region's African-American community, by renters, by the poor, and by the unemployed. [72] The Brown study indicates that "more than a third of the region's 1.7 million residents lived in areas that suffered flooding or moderate to catastrophic storm damage, according to FEMA." [73] Further, the Brown study calculates that in damaged areas "45.8% [of the residents were] black, compared to 26.4% in undamaged areas." [74] Also it reported that 20.9% of households in damaged areas were below the poverty line, compared to 15.3% in undamaged areas. [75] These statistics are grounded in United States Census Bureau data showing that Gulf Coast states are home to greater percentages of African-Americans than the United States as a whole: 32.5% of [*1788] Louisiana's adult population is African-American compared to 12.2% in the United States overall. [76] Also, Census data shows that 14.9% of Louisiana families live below the poverty line, whereas only 10.1% do so nationally. [77]

This demographic data is significant for notice planning to a class of Katrina evacuees because these people are not located at the addresses on file for them in databases complied before the storm, and because lower income and minority individuals are more difficult to obtain a better address for, using commercially available sources. Also, the Brown study's conclusion that as

---

[67] Id.

[68] 1.36 million individual applicants had registered with FEMA as of data available on October 13, 2005. Katrina's Exodus, Hurricane Aftermath, supra note 55.

[69] Logan, supra note 32, at 7.

[70] Id.

[71] See id.; Susan L. Cutter, The Geography of Social Vulnerability: Race, Class, and Catastrophe, Soc. Science Research Council (Sept. 23, 2005), available at _http://understandingkatrina.ssrc.org/Cutter/pf/_.

[72] See Logan, supra note 32, at 1.

[73] Id.

[74] Id.

[75] Id.

[76] Peter Fronczek, U.S. Census Bureau, Income, Earnings, and Poverty from the 2004 American Community Survey (2005), available at _http://www.census.gov/prod/2005pubs/acs-01.pdf_.

[77] Id.

many as 80% of New Orleans' African-American population may never return could have long-term implications on future class actions. [78]

The Katrina mobility concerns simply remind us of a problem we face all over the United States, with classes of all types. United States Census data shows that 14.2% of all residents moved between 2002 and 2003 and, on average, 15.5% moved each year since 1993. [79]

## B. Address Accuracy and Updating

Numerous means are available for address updating efforts and courts have demanded varying solutions in differing cases. The simplest form of address updating efforts is the commonly employed NCOA database made available to data company licensees by the United States Postal Service. [80] Built from submissions of change of address cards, the NCOA allows businesses to compare a mailing list with the NCOA database and obtain an updated address if a new address is contained in the NCOA. [81] The updating services cost fractions of a penny per address, and avoiding the use of the NCOA is generally an abdication of responsibility when there are addresses on a mailing list that were not recently obtained. [82]

It is equally important to know the limitations of the NCOA and the limitations of USPS delivery and mail-forwarding procedures so **[*1789]** that a false sense of security is not given to courts when mailings are sent to class members in class action cases. The NCOA database only provides the most recent four years of moves. [83] The lists of names and addresses known and provided by defendants often contain entries provided to them more than four years ago, and class periods often go back more than four years. Therefore, if a person moved before the most recent four-year period, that move would not be updateable by the NCOA.

Upwards of 40% of all movers - including those who moved within the last four years - do not report their move to the post office and thus would not be in the NCOA database at all. [84] The fact that an address that is not updated by the NCOA data does not mean that it is accurate. Some addresses are not updated because they are already accurate, and some because the NCOA could not find a valid forwarding address on file within the last four years, or did not have a move on file for that person at all. [85]

It is also an important fact that the USPS will only automatically forward mail to a new address based on a Change of Address (COA) it has on file for twelve months after a move. [86] Additionally, the USPS will only return a piece of mail to the sender with an indication of a new address based on a COA it has on file for eighteen months after the move. [87] After eighteen months from the time of a move, the USPS will return a piece of mail if undeliverable as addressed, or if addressed to the name of a person at a valid address (e.g., the former occupant many years ago) as long as the actual resident at the household takes

---

[78] See Logan, supra note 32, at 1.

[79] Jason P. Schachter, U.S. Census Bureau, Geographical Mobility: 2002 to 2003: Population Characteristics (2004), available at http://www.census.gov/prod/2004pubs/p20-549.pdf.

[80] See U.S. Postal Serv., NCOALink Systems, http://www.usps.com/ncsc/addressservices/moveupdate/changeaddress.htm (last visited Apr. 12, 2006).

[81] See id.

[82] See id.

[83] See id.

[84] See Pitney Bowes, Reduce Returned Mail (2002). The NCOA does not include temporary COAs, only permanent COAs. See id.

[85] See U.S. Postal Serv., NCOALink Systems, supra note 80.

[86] See U.S. Postal Serv., Discount Letters, Cards, Flats, and Parcels, http://pe.usps.com/cpim/ftp/manuals/qsg300/q230a.pdf?pe_QSG300_pdf_5 (last visited Apr. 21, 2006).

[87] See id.

the time to refuse delivery, deliberately mark it to be "returned to sender," and placed it back in the mail, instead of simply discarding the piece. [88]

[*1790] We should not assume that all wrongly addressed mail will be forwarded by each and every recipient. One can test the fallacy behind this assumption by simply sending some mailings from your office address to the former resident of your present home address. If you lived there for more than four years, the mailing with the former resident's name on it will likely arrive at your home address.

There are shortcomings of the NCOA even for updating addresses with the moving records that it does contain. As reported by the Web site of a full service licensee of NCOALink: "You may not receive a ZIP + 4 Code for some addresses. Usually ZIP + 4 match rates run in the 85% to 93% range. The match rate is different for each list and can run from 0% to 100%… . You may receive an incorrect ZIP + 4 Code and incorrectly standardized address." [89]

Additional shortcomings with the NCOA data limits the NCOA database's ability to provide a new address even for people who have chosen to submit COA's within the last four years: 13.8% of the moves contained in the NCOA database are simply COA submissions stating that the person, company, or family moved and left no forwarding address, and would result in no address to mail to these movers. [90] Another 1.18% of the moves in the NCOA database are moves where the COA form specifies an unconfirmed delivery point for the new address given, such that no new address is provided when a list is submitted. [91] Another 3.92% of the submissions simply note that a P.O. Box was closed, and another 0.18% represents moves to foreign locations. [92] These instances also yield no updateable address for these movers. [93]

Additional services do exist for updating addresses beyond the NCOA. [94] These services generally rely on credit bureau data to "lookup" a current address based on known information about a person, e.g., a Social Security number (SSN), and depending on the ready availability of data these can be used to enhance the accuracy of the address before mailing a notice to the class member. [95] The evacuee [*1791] demographic data for a class of Katrina victims may suggest that limited success in this area can be expected. This is because the success rate of "lookup" services for lower-income and minority populations may be greatly decreased.

When SSNs are available, and, depending on the quantity of lookups, when a reasonable and steeply negotiated cost can be employed to match SSNs with credit bureau data, these lookups can be performed on all SSNs for which NCOA did not return a new address, in order to attempt to update the addresses further prior to mailing.

However, statistics on credit bureau data accuracy (from which SSN address lookups must be performed), especially for lower-income demographic groups like the large majority of Hurricane Katrina evacuees, indicate that the notice planner must not be overly optimistic with the net percentage of mailings that will be accurate even after a reasonable and best effort to update. A conservative estimate on the reach to good addresses achievable by mailings in some cases where the list is old to begin with

---

[88]   See id. Reports on the treatment of the tons of junk mail sent by marketers and received by households show that little of this assistance would be happening. In fact, as cited in a 1999 study by the School of Information Management and Systems at the University of California at Berkeley, Americans receive almost four million tons of junk mail per year, and about forty-four percent of it is never opened. See Peter Lyman & Hal R. Varian, How Much Information? (2000), *http://www.sims.berkeley.edu/research/projects/how-much-info/index.html*.

[89]   See Lortondata, Move Update, *http://www.lortondata.com/cgi/ncoa_moredetails.asp* (last visited Apr. 12, 2006).

[90]       See   U.S.   Postal   Serv.,   NCOALink   Interface   Distribution   Required   Text   Document, *http://ribbs.usps.gov/files/NCOAlink/DIST_INFO/DIST_RTD_V3.PDF* (last visited Apr. 12, 2006).

[91]   See id.

[92]   See id.

[93]   See id.

[94]   See, e.g., Experian, Metronet, *http://www.experian.com/products/metronet.html* (last visited Apr. 12, 2006) (providing one such service).

[95]   See id.

may be 50%. This modest reach estimate by mailings could be due to: a class period that dates far back; addresses that are very old and have not been updated; high mobility among the class demographics; little class member activity with the top three consumer reporting agencies (CRAs) used to perform SSN matching/address updating; and SSN matching itself, which is not fool-proof.

Data supporting conservative reach expectations via mailings includes Mediamark Research Inc. (MRI) [96] data which indicates that only 51.7% of lower income adults personally have auto loans for a new car, personal loans, home improvement loans, home mortgages, mortgage refinance/consolidation loans, personal lines of credit, home equity lines of credit, or any major credit/debit cards, from which credit bureau data is built. [97] Similarly, a 1997 report noted that only 39% of "poor" households held at least one credit card. [98] Therefore, SSN checks through the top three CRAs would not include updated [*1792] addresses for those class members (48.3%) who do not have loans, mortgages, credit lines, or credit/debit cards.

Research also indicates that the data provided by the top three CRAs is not always accurate. First, information is added to consumer files or updated as it is received from creditors, government entities (e.g., lawsuit and bankruptcy documents, however infrequently), collection agencies, and other third parties (furnishers). SSNs are often missing from consumer credit information that the CRAs receive from furnishers, largely due to concerns about privacy and identity theft. Recently, only the last four digits of SSNs are associated with reportable data. [99] Errors are also common in recording SSNs and other personal identifying information needed to update addresses for potential class members:

(1) A 2004 study of 197 credit reports by the Public Interest Research Group found that 54% of them contained errors in basic personal identifying information, including name, SSN, birth date, current and past addresses, and employers. [100]

(2) A 1998 study of 133 credit reports by the Public Interest Research Group found that 41% of reports had incorrect demographic information. [101]

(3) The CRAs account for the possibility of an incorrect SSN match because they allow "partial matches" (if seven or eight of the digits match) on SSNs when adding data. They report that this happens 1% to 2% of the time. [102]

The Public Interest Research Groups also found that 20% of credit reports were missing major credit cards, loans, or mortgages. [103] Additionally, a study conducted in 1999 on 248,027 individuals found that only 80% of them had active

---

[96] See Mediamark Research Inc., *http://www.mediamark.com* (last visited Apr. 12, 2006) ("As the leading U.S. supplier of multimedia audience research, MRI provides information to magazines, television, radio, Internet, and other media, leading national advertisers, and over 450 advertising agencies … . Mediamark's national syndicated data are widely used by these companies as the basis for the majority of the media and marketing plans that are written for advertised brands in the United States.").

[97] Based on MRI data for adults with a household income of less than $ 35,000. See id.

[98] Edward J. Bird et al., Credit Cards and the Poor 9 (Oct. 1997) (unpublished discussion paper no. 1148-97, on file with the Institute for Research on Poverty), available at *http://www.irp.wisc.edu/publications/dps/pdfs/dp114897.pdf*.

[99] Fed. Trade Comm'n, Report to Congress: Under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003, at 38 (2004), available at *http://www.ftc.gov/reports/facta/041209factarpt.pdf*.

[100] Alison Cassady & Edmund Mierzwinski, Nat'l Ass'n of State Pub. Interest Res. Groups, Mistakes Do Happen: A Look at Errors in Consumer Credit Reports (2004), available at *http://uspirg.org/reports/MistakesDoHappen2004.pdf*.

[101] Jon Golinger & Edmund Mierzwinski, Nat'l Ass'n of State Pub. Interest Res. Groups, Mistakes Do Happen: Credit Report Errors Mean Consumers Lose (1998), available at *http://uspirg.org/reports/mistakesdohappen3_98.pdf*.

[102] Fed. Trade Comm'n, supra note 99, at 39.

[103] Golinger & Mierzwinski, supra note 101.

80 Tul. L. Rev. 1771, *1792

accounts listed on their credit reports.  [104] This means that approximately 50,000 of them were not being updated with new information, including any new address.

 [*1793]  Inaccurate credit report information can be corrected by consumers who find errors in their credit reports. However, a 2003 study of 1000 adults found that only 35% of those with incomes under $ 35,000 had obtained a copy of their credit report in the past two years.  [105] Therefore, given a demographic of Hurricane Katrina evacuees as class members described above, self-correction should not be expected by a significant percentage of people.

In sum, the evidence presented above reveals that CRAs do not have completely accurate information for anything close to perfect address updating. This is a particular concern when dealing with lower socioeconomic classes. It also appears that updateable addresses may be difficult to get for those class members who do not have any current open accounts or whose information is missing from the CRAs.

For most classes of people affected by Hurricane Katrina, the address updating and postal delivery issues play a role - but not for all classes. For example, in In re High Sulfur Content, a demographic study of the class compared with the general population indicated that the class was not generally consistent with the overall hurricane evacuee population. Whereas the overall hurricane evacuee population was disproportionately lower income and minority, the In re High Sulfur Content class members were not. Furthermore, the class members' mailing addresses had been recently obtained.  [106] Additionally, class membership was limited to those in certain Gulf areas who had purchased gasoline for a vehicle during a several week period in the spring of 2004.  [107] In this regard, the mass of Hurricane Katrina-impacted people shared a common thread: 54% of poor households in New Orleans did not have a car.  [108] Evacuee survey data bears this out as well. A study conducted at Houston shelters between September 10, 2005, and September 12, 2005, asking evacuees why they did not leave before the storm hit, revealed that 55% of them did not have a car.  [109] Therefore, the difficulties with obtaining adequate notice coverage of the In re High Sulfur Content class in 2006 would not be as great as if the class members bore a consistent demographic stamp, as found in the entire Gulf Coast population or hurricane-ravaged areas. Similarly, the Froeber class, involving auto insurance  [*1794]  policyholders, would also prove inconsistent with the poorest evacuee demographics, as would the In re Educational Testing Services class of teaching candidates.

C. Mail Readership

 Once an address is accurate we should not simply assume that every notice - regardless of its design - will be opened and read. The 2003 USPS Household Diary Study shows that only 12.4% of respondents indicated that they usually read all such mail. [110] Indeed other data on mail readership is disturbing. Studies show that 75% of all direct mail ends up in the trash unopened; [111] and that four billion tons of junk mail is received every year of which 44% is unopened.  [112] Although the USPS Diary

---

[104]  Robert B. Avery et al., An Overview of Consumer Data and Credit Reporting, 89 Fed. Res. Bull. 47, 51 (2003), available at *http://www.federalreserve.gov/pubs/bulletin/2003/0203lead.pdf.*

[105]  Id.

[106]  MDL No. 1632 (E.D. La. filed Jan. 20, 2005).

[107]  See id.

[108]  Sherman & Shapiro, supra note 6, at 2.

[109]  Wash. Post, Kaiser Fam. Found. & Harvard Univ. Survey of Hurricane Katrina Evacuees 6 (2005), *http://www.kfl.org/newsmedia/upload/7401.pdf.*

[110]  Malcolm Harris et al., U.S. Postal Serv., The Household Diary Study: Mail Use and Attitudes in PFY 2003 (2004), *http://www.usps.com/householddiary/_pdf/HDS2003.pdf.*

[111]  See Todd Meredith, Open the Envelope: Getting People To Open the Direct Mail They Receive, Campaigns & Elections (2004), available at *http://www.findarticles.com/p/articles/mi_m2519/is_10_25/ai_n8583727.*

[112]  See id.; Lyman & Varian, supra note 88, at 119.

80 Tul. L. Rev. 1771, *1794

study does not study legal notices, it does show that even "official" mail is at risk of not being opened and read, as 51.8% of standard "Federal Government" mail is not even opened immediately. [113] There is simply an enormous volume of unrequested mail that households are buried with, as 76.2 billion pieces of advertising are received by households each year. [114]

Therefore, it is critical that outside envelopes be designed to "alert the recipient to the importance of the legal notice." The authors designed the model which has been adopted by many practitioners and courts to help deal with the growing mail readership problem. The outside envelope is shown as part of the illustrative notice models the authors collaborated with the Federal Judicial Center to create, and which are now housed at their Web site, *http://www.fjc.gov*. [115] The properly designed outside mailer is something that must be done for any case where direct-mailed notice is appropriate and necessary, but it is not a panacea for the "reach" issues caused by the blizzard of junk mail, which stands at the average level of 13.2 pieces per household per week. [116] While a well-designed outside mailer can increase the  [*1795]  chances the mail piece will be read, the reality is this: "people are not likely to read each and every piece of mail they perceive to be junk mail." [117] Even the Manual for Complex Litigation calls for techniques to make outside mailing envelopes "catch the attention of class members to whom it applies: "A short, informative blurb ("If you were exposed to ___, you may have a claim in a proposed class action settlement") on the outside of a mailing envelope serves a similar purpose." [118]

The level of advertising mail received increases as household income increases. According to the USPS data, households with income between $ 50,000 and $ 60,000 per year receive 18.9 pieces of advertising mail per week, and this increases to 29.5 pieces per week for households with income greater than $ 100,000 per year. [119] Outside "headlines" - or "notice of the notice" - must try to overcome instinctive disregard of junk mail that has grown with increasing awareness of the tricks artful marketers now routinely use. A few illustrations of this sort of "junk mail" that consumers regularly receive, and are likely to disregard or discard are: a typical envelope that trumpets "Important Document Enclosed" which is a pitch from a credit card company; the plain brown envelope with official type that says "Rate Overpayment Notification," which is a long distance telephone service offer; or the "Final Notice" from Exxon that is a credit card offer. Numerous manila envelopes with government-style return address indicia, including the standard "penalty for private use" language, turn out to be various solicitations.

V.

"Reach" Tools Are Widely Used

 Considering the mobility, address/postal, and communication concerns discussed above, which become even more problematic when trying to contact Hurricane Katrina evacuees who may have permanently relocated, the importance of documented reach evidence should not be underestimated. In particular, an effective reach must be established for consumer cases in which mailing lists are unobtainable, incomplete, or inaccurate. In these types of situations, it is imperative for qualified notice professionals to provide courts with conservative and credible evidence as to the percentage of class members exposed  [*1796]  to notice. Courts need to be aware that "net reach" [120] and "frequency of exposure" [121] methodologies are

---

[113] See *Harris et al., supra* note 110, tbl. A3-48a.

[114] Id.

[115] See Fed. Judicial Ctr., The Federal Judicial Center's "Illustrative" Forms of Class Action Notices, *http://www.fjc.gov/public/home.nsf/pages/376* (last visited Apr. 12, 2006).

[116] *Harris et al., supra* note 110, at 38.

[117] See Hilsee et al., supra note 53, at 1359, 1376.

[118] Manual for Complex Litigation (Fourth), supra note 27, 21.31.

[119] *Harris et al., supra* note 110, tbl. A4-1.

[120] See Jack Z. Sissors & Roger B. Baron, Advertising Media Planning 92 (6th ed. 2002) ("Reach is a measurement of audience accumulation. Reach tells planners how many different prospects or households will see the ad at least once over any period of time the planner finds relevant. Reach is usually expressed as a percentage of a universe with whom a planner is trying to communicate.").

80 Tul. L. Rev. 1771, *1796

commonly and consistently used by communication professionals, and specifically, qualified notice experts in the field, to calculate mathematically the number of persons exposed to "vehicles" containing communication messages as well as the number of times they are exposed. These techniques were first brought to class action litigation in In re Domestic Air Transportation Antitrust Litigation [122] and have since been well-established and accepted by courts, allowing them to review the adequacy of notice from an objective basis - the actual percentage of the class exposed to notice. [123] In California, one of the most important states for class action practice because of its size, case law specifically demands, when publication notice is necessary, that "the notice given should have a reasonable chance of reaching a substantial percentage of the class members." [124]

Audience research data and techniques have been long relied upon by advertising and media planning firms around the world for circulation [125] and reach and frequency planning. [126] In fact, reach and frequency planning has been cited in prominent advertising and [*1797] communications textbooks [127] with a leading treatise saying it must be used: "In order to obtain this essential information, we must use the statistics known as reach and frequency." [128] And ad firms around the world almost uniformly use highly reliable survey data as well as software to calculate and figure it out, [129] in dozens of different countries. [130]

---

[121] Id. at 99 ("Frequency is a companion statistic to reach… . Frequency is a measure of repetition, indicating to what extent audience members were exposed to the same vehicle or group of vehicles.").

[122] *141 F.R.D. 534, 548-55 (N.D. Ga. 1992).*

[123] Numerous courts have since relied upon the notice dissemination methodology described in the decision in *In re Domestic Air Transportation Antitrust Litigation, 141 F.R.D. 534, 548-55 (N.D. Ga. 1992),* while ruling on notice issues. See, e.g., *Macarz v. Transworld Sys., Inc., 201 F.R.D. 54, 60 (D. Conn. 2001); In re Motorsports Merch. Antitrust Litig., 112 F. Supp. 2d 1329, 1332 (N.D. Ga. 2000); Burke v. Ruttenberg, 102 F. Supp. 2d 1280, 1317 (N.D. Ala. 2000);* In re Toys "R" *Us Antitrust Litig., 191 F.R.D. 347, 350-51 (E.D.N.Y. 2000); In re Lease Oil Antitrust Litig. (No. II), 186 F.R.D. 403, 429-30 (S.D. Tex. 1999); In re Prudential Ins. Co. of Am. Sales Practices Litig., 177 F.R.D. 216, 233 (D.N.J. 1997); In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 515 n.19 (S.D.N.Y. 1996); In re Potash Antitrust Litig., 161 F.R.D. 411, 413 (D. Minn. 1995); Carlough v. Amchem Prods., Inc., 158 F.R.D. 314, 325, 327-28 (E.D. Pa. 1993); Ex parte Masonite Corp., 681 So. 2d 1068, 1075 (Ala. 1996); Cox v. Shell Oil Co., Civ. A. No. 18844, 1995 WL 775363, at 7-8* (Tenn. Ch. Ct. Nov. 17, 1995).

[124] *Cartt v. Superior Court, 124 Cal. Rptr. 376, 386 (Cal. Ct. App. 1975).* See generally Elizabeth J. Cabraser, California Class Actions Practice and Procedure (2003) (covering all requirements, tactics, and forms for use in class action litigation in California state courts and including a notice chapter contributed by the first author).

[125] Audit Bureau of Circulation (ABC) is the industry's leading, neutral source for documentation on the actual distribution of newspapers printed and bought by readers. See Audit Bureau of Circulations, *http://www.accessabc.com* (last visited Apr. 21, 2006). Established in 1914, ABC is the leading third-party auditing organization in the United States. Id. ABC is a nonprofit cooperative formed by media, advertisers, and advertising agencies to audit the paid circulation statements of magazines and newspapers. Widely accepted throughout the industry, it certifies over 3000 publications, categorized by metro areas, region, and other geographical divisions. Id.

[126] 90% to 100% of media directors use reach and frequency planning; See Peter B. Turk, Effective Frequency Report: Its Use and Evaluation by Major Agency Media Department Executives, J. Adver. Res., Apr./May 1988, at 55, 56; Peggy J. Kreshel et al., How Leading Advertising Agencies Perceive Effective Reach and Frequency, 14 J. Adver. 32, 35-38 (1985).

[127] Textbook sources that have identified the need for reach and frequency for years include: Donald W. Jugenheimer & Peter B. Turk, Advertising Media 123-26 (1980); Kent M. Lancaster & Helen E. Katz, Strategic Media Planning 120-56 (1989); Jack Z. Sissors & Lincoln Bumba, Advertising Media Planning 93-122 (4th ed. 1993); Jack Z. Sissors & Jim Surmanek, Advertising Media Planning 57-72 (2d ed. 1982); Jim Surmanek, Introduction to Advertising Media: Research, Planning, and Buying 106-87 (1993).

[128] Am. Ass'n of Adver. Agencies, Guide to Media Research 25 (1993).

[129] For example, Telmar is the world's leading supplier of media planning software and support services. See Telmar, Information Services & Software Solutions, *http://www.telmar.com* (last visited Apr. 21, 2006). Over 3000 users in 25 countries, including 95% of the world's top agencies, use Telmar systems for media and marketing planning tools including reach and frequency planning functions. See id. Established in 1968, Telmar was the first company to provide media planning systems on a syndicated basis. See id.

80 Tul. L. Rev. 1771, *1797

[*1798]  These tools are readily available to qualified experts and professionals. Especially where heightened concerns about whether dislocated people will be reached by a communications program exist, as among post-Katrina impacted classes, there is no valid reason why they should not be employed at the outset of any notice program relying on media coverage. Many notice programs would improve dramatically.

VI. Common Notice "Reach" Flaws in the Wake of Hurricane Katrina

Reach-related notice plan flaws could become significant factors after Hurricane Katrina:

(1) Reach Shortfalls. A notice program can fall short of reaching a large percentage of class members who are now living in areas away from their original homes.

(2) No Quantitative Data. Data on hurricane evacuees' geographic locations are available and should be taken into account by the expert studying the reach issue, and provided to the courts so that they can review how many class members will have the opportunity to get notice as a percentage of the total, before being asked to approve such a program.

(3) Doesn't Reach Class Members Where They Are. After Katrina, relying on the New Orleans Times-Picayune to reach former [*1799]  residents of St. Bernard Parish or those of the Lower Ninth Ward would be mere window-dressing.

(4) Isn't Customized To The Class Member: Sometimes the planner does not pay attention to how to reach a certain type of class member, and instead applies worn-out techniques to all classes. For example, radio may be better to reach a class of lower income Katrina evacuees.

(5) Notice "Available" but Illusory: Hurricane victims may remain scattered for some time. It could get expensive to reach them in numerous locations where mailings aren't possible. However, simply posting notice on a website and/or publishing in a single leading newspaper, and arguing that notice was available will not be effective. According to the Supreme Court that approach is not effective, [131] nor according to media planning treatises calling for careful consideration of "the scheduling of different media, and their combination." [132]

---

[130] In the United States, MRI data, which has a 95% confidence interval and is used by 90 of the top 100 U.S. media firms, have been used for publications, http://www.mediamark.com, Neilsen Media Research for television, http://www.nielsonmedia.com, and Arbitron, Inc. for radio, http://www.arbitron.com. There are also many audience data tools specific to various countries. See, e.g., Roy Morgan Research, International, http://www.roymorgan.com.au (Australia) (last visited Apr. 12, 2006); Arbeitsgemeinschaft Media-Analysen (MA), http://www.media-analyse.at (Austria) (last visited Apr. 12, 2006); Plurimedia-Produits, Centre d'Information sur les Media (MMP CIM), http://www.cim.be/base/fr/m/mm.html (Belgium) (last visited Apr. 12, 2006); Estudos Marplan, http://www.ipsos.com/news/releases/2000/Marplan.aspx (Brazil) (last visited Apr. 12, 2006); Print Measurement Bureau (PMB), http://www.pmb.ca/ (Canada) (last visited Apr. 12, 2006); Newspaper Audience Databank Inc. (NADbank), http://www.nadbank.com/ (Canada) (last visited Apr. 12, 2006); Taylor Nelson Sofres (TNS) Gallup, http://www.gallup.dk/ (Denmark) (last visited Apr. 12, 2006); Kansallinen Mediatutkimus, http://www.levikintarkastus.fi/ (Finland) (last visited Apr. 12, 2006); Press Quotidienne Nationale, http://www.observatoire-medias.info/mot.php3?id_mot=65 (France) (last visited Apr. 12, 2006); Association pour la Promotion de la Presse Magazine (APPM), http://www.aepm.fr/ (France) (last visited Apr. 12, 2006); Institut fur Demoskopie Allensbach (AWA), http://www.ifd-allensbach.de/ (Germany) (last visited Apr. 12, 2006); Arbeitsgemeinschaft Media-Analyse e.V. (MA), http://www.agma-mmc.de/ (Germany) (last visited Apr. 12, 2006); Focus, Athenian Marketing Research Centre (Bari/NSR), http://www.focus.gr/ (Greece) (last visited Apr. 12, 2006); Media Analysis, Szonda Ipsos, http://www.szondaipsos.hu/ (Hungary) (last visited Apr. 12, 2006); Audipress, http://www.audipress.it/ (Italy) (last visited Apr. 12, 2006); SummoScanner, Alke Bassler & Costa Tchaoussoglou, Searching for Best CASI Practices: Experiments for a New Data Collection Method (1999), http://www.cebuco.nl/cms/data/images/download/Paper%20Bassler-Tchaoussoglou.pdf (The Netherlands) (last visited Apr. 12, 2006); ACNielsen Media Readership Survey, http://www.acnielsen.co.nz/ (New Zealand) (last visited Apr. 12, 2006); Forbruker & Media, http://www.tns-gallup.no/index.asp?aid=12085&title=Forbruker+%26+Media&path_by_id=/12000/12003/12018/12085 (Norway) (last visited Apr. 12, 2006); Norsk Medieindex, http://www.synovate.no (Norway) (last visited Apr. 12, 2006); MediaUse, http://www.ltpes.lu/Projets_Pedagogiques/MediaUse/index.jsp(Luxembourg) (last visited Apr. 12, 2006); All Media and Products Survey, AMPS, http://www.nrf.ac.za/sada/ahdetails.asp?catalognumber=0045 (South Africa) (last visited Apr. 12, 2006); Orvesto Konsument, http://www.annons.se/?get=content&action=view&id=127-37 (Sweden) (last visited Apr. 12, 2006); MACH Consumer, http://www.wemf.ch/d/studien/machconsumer.shtml (Switzerland) (last visited Apr. 12, 2006); Ukraine Print Survey, http://text.tns-global.com/where-are-tns/europe/ukraine.htm (Ukraine) (last visited Apr. 12, 2006); National Readership Survey (NRS),

80 Tul. L. Rev. 1771, *1799

(6) Reaching Class With Outdated Tools: Evacuees now living in Houston or Atlanta are not reading the same Louisiana newspapers they previously read. The notice planner should take this into account.

VII. Design the Notice To Be "Noticed"

Perhaps the most significant notice issue raised by Hurricane Katrina, outside of finding an appropriate ways to ensure reaching class members if they are not located at their former residence, is getting class members to pay attention to a notice that may affect them. We know that people may not read every piece of mail received, especially those perceived to be junk mail. Additionally, we know that people are not likely to read the entire contents of a newspaper or magazine. So, why do so many mailed and published notices appear in small type, with absolutely nothing calling to the attention of the class members it affects? Too often attorneys, and settlement administrators working for them, format, mail, and publish notices without a prominent callout (a "headline"). They are too often accustomed to designing notices with old "legal pleading" style **[*1800]** content in uniformly small font sizes similar to what the Court criticized in 1950 in Mullane. [133]

Even the judiciary understands the importance of creating notices that are "designed to be noticed." At a hearing before the Advisory Committee on Civil Rules of the Judicial Conference of the United States, the first author testified during the comment period on proposed changes to Rule 23 that notices should be "designed to be noticed," and the committee expressed an interest in "how the rule itself that we've proposed could better support the creation of those, or the insistence on those, kinds of notices." [134]

The Manual for Complex Litigation itself supports this sentiment, advising practitioners to take the necessary precautions to capture the attention of class members:

Published notice should be designed to catch the attention of the class members to whom it applies. In many cases, a one-page summary of the salient points is useful, leaving fuller explanation for a separate document. Headlines and formatting should draw the reader's attention to key features of the notice. [135]

When developing a notice, one must be aware of the significance of the headline. "We pick out what we wish to read by headlines, and we don't want those headlines misleading." [136] Therefore, it is critical that the headline immediately attracts the attention of its target with a large, bold, noticeable, and clear lead in. With headlines now endorsed in the Manual for Complex

---

http://www.nrs.co.uk/ (United Kingdom) (last visited Apr. 12, 2006); Simmons Market Research Bureau (SMRB), http://www.smrb.com/ (United Kingdom) (last visited Apr. 12, 2006); Scarborough Research, http://www.scarborough.com/ (United Kingdom) (last visited Apr. 12, 2006).

[131]  Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 320 (1950).

Publication may theoretically be available for all the world to see, but it is too much in our day to suppose that each or any individual beneficiary does or could examine all that is published to see if something may be tucked away in it that affects his property interests.

[132]  Helen Katz, The Media Handbook 128 (2d ed. 2003).

[133]  Mullane, 339 U.S. at 320.

[134]  Judge Lee H. Rosenthal also stated to the first author:

I want to tell you how much we collectively appreciate your working with the Federal Judicial Center to improve the quality of the model notices that they're developing. That's a tremendous contribution and we appreciate that very much. You raised three points that are criteria for good noticing, and I was interested in your thoughts on how the rule itself that we've proposed could better support the creation of those or the insistence on those kinds of notices.

Conversation between Lee H. Rosenthal, Judge, Advisory Comm. on Civil Rules of the Judicial Conf. of the United States, and Todd B. Hilsee, President, Hilsoft Notifications, in Washington, D.C. (Jan. 22, 2002).

[135]  Manual for Complex Litigation (Fourth), supra note 27, 21.31.

[136]  Hopkins, supra note 43, at 17.

80 Tul. L. Rev. 1771, *1800

Litigation, the class action field recognizes what communications professionals have long known: [137] "The headline is the most important element in most advertisements. It is the telegram which decides the reader whether to read the copy… . The wickedest of all sins is to run an advertisement without a  [*1801]  headline." [138] Without a well-developed headline, your audience may not read the notice at all.

It is critical that the headline be directed to the proper individuals, alerting them as to why they need to read the notice, with a clear and specific focus. "What you have will interest certain people only, and for certain reasons. You care only for those people. Then create a headline which will hail those people only." [139] In 1947, the Mullane Court criticized the publication notice for badly missing the due process mark, with a headline that was too broad. [140] The Mullane notice invited the broad group of "the People of the State of New York" to read the notice, and provided an exuberant listing of trust fund accounts. [141] The Mullane Court criticized this approach: "The chance of actual notice is further reduced when as here the notice required does not even name those whose attention it is supposed to attract, and does not inform acquaintances who might call it to attention." [142] The Mullane notice would have benefited from a headline that spoke directly to its intended reader, not the world.

The prescriptions for creating noticeable notices have been presented to and approved by dozens of courts. One example in the In re High Sulfur Content notice carried a large bold headline that alerted people to the geographic implications while being widely published in a wide geographic area: "If you bought gasoline in parts of Louisiana, Mississippi, Alabama, and Florida from May 11 to June 2, 2004, you may be eligible for a payment from a class action settlement." [143] To write an effective headline know your audience and focus on it. There are "three guiding principles for headlines. Present a benefit to the reader. Make the benefit quickly apparent. Make the benefit easy to get." [144] Although the settlement should not be "sold" to the reader, in a settlement situation, the actual benefit that will secure readership is the potential recovery that the settlement has to offer class members as is illustrated in the FJC's settlement notice examples. [145] Self-interest is very important in attracting readers to a headline, as is the news that  [*1802]  comes from a headline. [146] Therefore, the "news" or "self-interest" that will best attract readership for a class certified for trial is the knowledge that important rights are at stake. [147]

The point of a class action notice is for it to be "noticed" by the class member. Therefore, we cannot ignore the fact that a notice is most likely delivered in an environment filled with numerous messages and distractions. For this reason it is important to effectuate good notice design by creating notices that incorporate attention-getting headlines and other graphic elements. The FJC's illustrative models use these effective communication techniques, as can be noted in the sample outside of mailing envelopes and prominent headline, both which increase the likelihood of the notice being noticed, opened, and read.

In today's class action world, it is necessary for practitioners and courts to adopt notices that adequately incorporate attention getting headlines and other design features that get notices noticed. Considering situations where dislocated Katrina victims now outside the Louisiana area must be prompted to pay attention to a notice that may be taking away significant rights, when

---

[137] See Manual for Complex Litigation (Fourth), supra note 27, 21.31.

[138] Ogilvy, supra note 46, at 104.

[139] Id. at 17.

[140] *Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 315 (1950).*

[141] Id.

[142] Id.

[143] See People, Mar. 27, 2006, at 35.

[144] Kenneth Roman & Jane Maas, How to Advertise 32 (1976).

[145] The headline for the illustrative notice for a securities settlement reads, "If you bought XYZ Corporation stock in 1999, you could get a payment from a class action settlement." Fed. Judicial Ctr., supra note 115.

[146] John Caples, Tested Advertising Methods 26 (5th ed. 1997).

[147] See Hilsee et al., supra note 53, at 1377-79.

they may not expect a notice to do so, these noticeability concepts are understandably important. However, failure to take such considerations into account in any notice program may result in notices that could easily be challenged since they much more likely to go largely unnoticed and unread.

VIII. Conclusion: Katrina Reminds Us to Follow the Due Process Lessons in All Class Action Cases.

 To satisfy due process, class members must get an adequate opportunity to learn about their rights in class actions started and settled on their behalf. Also, they should be able to get the benefits that a settlement intends to provide, while giving defendants the lasting res judicata effect they need.  148 Hurricane Katrina reinforces the need to follow the basic tenets of good notice practice. The well-established reach model is being used in Katrina-related class action cases to  **[\*1803]** ensure that class members are effectively reached where they are now located. Before Katrina, adequacy of notice has been an issue in matters where it was found that weak notice resulted in people missing a deadline.  149

Clearly practitioners need to take the importance of following the communications guidance and principles more seriously and apply them more consistently in class action cases. Probably because data was not provided to the trial court that would have revealed that a large percentage of people never got any notice, let alone on time, the United States Court of Appeals for the Third Circuit's 2001 decision in In re Orthopedic Bone Screw Products Liability Litigation mirrored the Supreme Court's Mullane decision from 1950:  150

It is incongruous, in the unique circumstances of this case, to find Sambolin culpable for his failure to note a small advertisement run once on page 50 of a newspaper he does not receive… . Because notice issues of this type are recurring in the district courts, we would be remiss if we did not express our concerns about the notice program used in this class action and suggest some better practices … .  151

 These lessons recur periodically as they did in the Boland v. Simon Marketing Inc., where the court was not provided proper reach evidence for Canada despite the attempt to bind Canadians through a U.S. settlement.  152 The Canadian court stated in an opinion that rejected any binding effect on Canadians who had not submitted to the U.S. court's jurisdiction:

I am satisfied that it would be substantially unjust to find that the Canadian members of the putative class in Boland had received adequate notice of the proceedings and of their right to opt out. Quite apart from the form and contents of the notice - Mr. Hilsee's reference to "wall to wall legalese" conveys no more than a hint of its eye-glazing opaqueness - I believe that its dissemination in Canada was so woefully inadequate that the decision should be held to offend the rules of natural  **[\*1804]** justice recognized in this court and, on that ground, to be not binding on the Canadian members of the putative class in Boland.  153

---

148  In Phillips Petroleum Co. v. Shutts, the Supreme Court held that in order to provide minimal due process, absent class members "must receive notice plus an opportunity to be heard and participate in the litigation" and that "the notice should describe the action and the plaintiffs' rights in it." *472 U.S. 797, 812 (1985);* see also *Kyriazi v. W. Elec. Co., 647 F.2d 388, 395 (3d Cir. 1981);   LaChance v. Harrington, 965 F. Supp. 630, 636 (E.D. Pa. 1997).*

149  See *In re Orthopedic Bone Screw Prods. Liab. Litig. 246 F.3d 315, 326-29 (3d Cir. 2001).*

150   *Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 315 (1950).*

Chance alone brings to the attention of even a local resident an advertisement in small type inserted in the back pages of a newspaper, and if he makes his home outside the area of the newspaper's normal circulation the odds that the information will never reach him are large indeed.

151   *In re Orthopedic Bone Screw, 246 F.3d at 327 & n.11.*

152  Boland v. Simon Mktg., Inc., No. 01-CH-13803 (Cir. Ct. Cook County, Ill., filed Aug. 22, 2001).

153  Parsons v. McDonald's Rests. of Can. Ltd., Nos. 02-CV-235958CP, 02-CV-238276, 2004 On. C. LEXIS 218 (Ont. Super. Ct. J. Jan. 13, 2004), aff'd, *Currie v. McDonald's Rests. of Can. Ltd., 74 O.R.3d 321, 321-41 (O. Ct. App. 2005).*

 Expert analyses at the outset would have pointed to major problems with both of these cases. Despite a common perception even among attorneys, it is not just plaintiffs lawyers who need good notice, which they do in order to satisfy their obligation to protect the interests of their classes. As witnessed in the Boland case, the settlement of a class action must have notice that satisfies due process, to protect defendants from collateral attacks on the settlement. [154] This takes place when a person challenges the settlement's binding effect in another court, typically arguing that he/she did not receive proper notice and therefore are not bound by its result. This consideration is increasingly important in class action litigation, because the threat of objection, where courts are often less than receptive to such interlopers who come in after the court has already preliminarily approved the settlement, is often less of a concern than the collateral attack, which comes after the effective date of the settlement has passed, after the defendant's money has been paid out and can't be recovered if a different court gives the defendant none of the ongoing protections he bargained for when settling the case in the first place. Thankfully, it has been seen in at least one recent South Carolina Supreme Court opinion that notice and reach evidence helps protect defendants against the fear of collateral attack, by ensuring adequate notice in the settlement, which came in the form of notice expert evidence on the effectiveness of that notice effort provided to the trial court overseeing the settlement and approving it. [155]

The "desire-to-inform" due process principle is reinforced by Hurricane Katrina: If you really wanted the class to know about their rights, why didn't you reach more of them? Bring the notice to their attention? Make it easy to respond?

In fact the due process lessons are bolstered by the things that are important post-Katrina in that notice must effectuate good communication with class members by: using plain language to communicate with the demographic groups represented by the  **[*1805]**  displaced populations; doing everything possible truly to inform people; employing dissemination methodologies to make sure that people are effectively reached by notices, even if they are no longer located where they were; frequency of exposure over a long enough period of time to ensure that people get multiple opportunities to act before their rights expire; and the design and style aspects that cause messages to come to the attention of affected individuals. When thousands of displaced people are not located where they were, in places where an address update cannot find them, the notice program must be even more careful to undertake methods that are calculated to inform them nevertheless.

Courts need to know that audience exposure calculations are routine and must be provided to them, so that weak and shameful notice programs can be avoided, like many of the notice programs prepared without expert evidence having been provided. This situation merely provides the next practitioner with a "low-bar" precedent so that he too may avoid giving good notice to class members. Sadly, this practice perpetuates itself across the United States.

When critical Hurricane Katrina due process notice issues arise, such as the notice issues raised by those alleging the denial of opportunity to know about the availability of payments in the McWaters v. FEMA case, the authors hope the notice experts in these cases bring accurate evidence on the reach and effectiveness of notice vehicles and provide recommendations concerning the best notice that is practicable to the attention of the courts that are overseeing these cases. Further, the authors hope that notice experts will only agree to testify in support of notice that is truly the best practicable notice. Late claims and lack of adequate notice in the wake of Katrina will most certainly be raised as an issue in the near future. Issues over the best way to notify the minorities who were disproportionately affected by Hurricane Katrina will arise. Pigford v. Veneman, perhaps the only case in history that required the notice "facilitator" to be called before Congress to answer a fact-finding investigation on allegations of shortcomings in a notice campaign, involved complaints by African-American farmers that thousands of late claims had resulted from inadequate notice of a settlement. [156] The most troubling part of this situation is evident from testimony before Congress. The notice facilitator had agreed to undertake a lesser "negotiated" program; yet, nonetheless, had proffered the lesser program to the district court as  **[*1806]**  "strong" and "resulting in broad notification," without revealing

---

[154] See *Epstein v. MCA, Inc., 179 F.3d 641, 645, 648-49 (9th Cir. 1999).*

[155] See *Hospitality Mgmt. Assocs., Inc. v. Shell Oil Co., 591 S.E.2d 611, 619-21 (S.C. 2004);* see also *Cox v. Shell Oil Co., Civ. A. No. 1884, 1995 WL 775363, at 6-8* (Tenn. Ch. Ct. Nov. 17, 1995).

[156] *Pigford v. Veneman, 215 F.R.D. 2 (D.D.C. 2003).*

80 Tul. L. Rev. 1771, *1806

any earlier or differing recommendations. [157] Courts must be wary, and experts must be careful. A notice expert who implements a negotiated program and is not able to deem that program to be the best practicable, must avoid opinion statements that could mislead the court into thinking it had received unbiased expert recommendations and evidence. [158] Otherwise, notice expert testimony does a great disservice to courts, can damage the integrity of the class action process, lowers the standards for effective notice, is harmful to class members who miss out, is easily disproved by an opposing notice expert under a collateral attack or other challenge, and even can become costly for taxpayers.

Simply going through the motions for notice plan development and implementation amounts to a violation of due process. This is because satisfying due process in class action notice is based on intending to do the right thing when giving notice - a desire actually to inform the absent class member. The lessons from Katrina magnify these concerns and simply remind us to apply the key due process lessons to all class action notice situations: giving enough time to reach people so that they have enough time to get information, process it, and act upon it; ensuring that extra steps are taken to reach those affected who are known individually; and taking extra steps to reach those unknown class members when it is not reasonable to notify them personally. Too often we see notice that amounts to nothing more than a mere gesture: the least amount of notice that it is perceived a judge (who is given no evidence to the contrary) will accept; deliberately less "noticeable" notice to hope for no critics (or claimants). But it is clear that decisions reminding us that we can do more, and that we must try harder than simply justifying the minimum effort possible, will keep on coming until we get it right: "Someone who actually wanted to **[*1807]** alert Jones that he was in danger of losing his house would do more when the attempted notice letter was returned unclaimed, and there was more that reasonably could be done." [159]

Tulane Law Review
Copyright (c) 2006 Tulane University
Tulane Law Review

---

End of Document

---

[157] Handling of Settlement of USDA Discrimination Against Black Farmers: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary, 108th Cong. (2004). The notice facilitator testified:

While legal notice administrators may recommend a course of action, they do not make the ultimate decision on which notice program is to be implemented. After counsel for the parties conclude negotiations to determine the terms and timing of the settlement, and after the Court approves the settlement, the notice administrator develops the final notice program, consistent with the settlement and in consultation with the parties.

Id. (testimony of Jeanne C. Finegan).

[158] In fact, the district court approved the notice program. See *Pigford v. Veneman, 355 F. Supp. 2d 148, 151 (D.D.C. 2005).*

[159] *Jones v. Flowers, 126 S. Ct. 1708, 1721 (2006).*